IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2022

## STATE OF TENNESSEE v. JEFFREY COCHRAN

**Appeal from the Criminal Court for McMinn County**
**No. 20-CR-144    Andrew Mark Freiberg, Judge**

_____

### No. E2022-00600-CCA-R3-CD

_____

The Defendant, Jeffrey Cochran, was convicted by a McMinn County Criminal Court jury of aggravated kidnapping, for which he is serving a nine-year sentence. *See* T.C.A. § 39-13-304(a)(5) (2018). On appeal, he contends that (1) the trial court erred in denying, in part, his motion to suppress, (2) the trial court erred in denying his motion for a continuance, (3) the evidence is insufficient to support his conviction, and (4) his sentence is excessive. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

Gregory P. Isaacs (on appeal) and Robert L. Jolley (at trial), Knoxville, Tennessee; and Randy George Rogers (at trial), Athens, Tennessee, for the Appellant, Jeffrey Cochran.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; Matthew Dunn and Ashley Ervin, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's conviction relates to a domestic incident involving his wife. The Defendant and his wife were separated and were divorcing. At the time, the Defendant's wife lived in a McMinn County, Tennessee home, and the Defendant lived in a Florida home, both of which were owned by the couple. The incident occurred in the McMinn County home. The Defendant was indicted for attempted first degree murder and especially aggravated kidnapping, and the State elected to dismiss the attempted first degree murder charge on the morning of the trial.

At the trial, McMinn County Sheriff's Corporal Nathan Stiles testified that in the early morning hours of October 19, 2019, he responded to a report of a suspicious van that the property owner did not recognize. Corporal Stiles said that when he reached the scene, he saw a van with a small dog inside. He checked the van's registration and eventually determined that the van had been sold to the Defendant, although it was not titled to him. Corporal Stiles advised the property owner that he could have the van towed from the property.

Corporal Stiles testified that he went to an address "two to three driveways down" from the property where the van was parked because his investigation had determined the address to be the one used when the Defendant bought the van. Corporal Stiles said that when he arrived, a woman came outside and identified herself as Karen Cochran, the victim, whom he described as visibly upset. He said that when he asked if the Defendant was home, she began to cry. Corporal Stiles said he noticed dried blood on the victim's forehead and left ankle. He said that when he asked her what had happened, she told him that she had been assaulted and that guns were inside the house. Corporal Stiles said that he asked for backup officers to come to the scene and that he took the victim to his patrol car. He said that as he spoke to the victim, he noticed a face appear briefly in a window of the house and later saw the Defendant come out the front door. Corporal Stiles said that after other officers arrived, they approached the porch and took the Defendant into custody.

Corporal Stiles testified that after the Defendant was in the backseat of a patrol truck, he advised the Defendant of his *Miranda* rights and questioned the Defendant, who provided information about where guns were located in the home. Corporal Stiles said he went inside the home to collect and photograph evidence. He said that glass in the house's backdoor had "fallen out" as if it had been "knocked in." He said a mark on the wall in a bedroom appeared to be from a gunshot. He identified photographs of the home, which were received as exhibits. They included photographs of a handgun on a small table behind a loveseat in the living room, a second firearm inside an antique box on the small table, a chambered round of ammunition in one of the firearms, and the apparent bullet hole in a bedroom wall. Corporal Stiles identified the firearms as Glock weapons of .40 and .45 caliber. He identified photograph exhibits depicting blood on the following items: the basement stairs, a rug, a "shop vac," and a wall near the bottom of the basement stairs. He also identified photograph exhibits depicting an unfired round of .22-caliber ammunition on the basement floor, a container of zip ties on top of the washer and dryer, the words "My Blood" spray painted on the wall behind the washer and dryer, and the words "My Blood On" and other indiscernible writing spray painted on a wall.

Corporal Stiles identified photograph exhibits showing the broken window in the home's backdoor, a shoe mark on the door, and a tire rim on the back porch. He identified photograph exhibits depicting the victim with dried blood on her nose, her forehead, her hair, her clothing, and her left ankle. He also identified photograph exhibits showing a belt

around her waist. He said that in his interactions with the victim, the belt did not restrict the victim's movements or her use of her hands. Video recordings from Corporal Stiles's body camera, which showed portions of his interactions with the victim and his conversation with the Defendant after the Defendant was in custody in the back of a patrol truck, were played for the jury.

Corporal Stiles acknowledged that he had not turned on his body camera immediately when the victim came out of the home. Thus, the video recording of the victim began during an ongoing interaction with Corporal Stiles. The recording showed the following: When Corporal Stiles asked what happened to the victim's head, she stated that "he" knocked her down the stairs. Other evidence established that she was speaking about the Defendant. Some of the victim's statements are not discernible due to her crying, but Corporal Stiles called for backup, stating that the Defendant had a gun and had made threats. She stated that the Defendant sent her outside to talk to Corporal Stiles and told her, "Don't let them take me," when he saw the patrol car arrive. She stated the Defendant had never been arrested. While walking with Corporal Stiles to his patrol car, she stated that the Defendant had two pistols and that he claimed to have more guns. She said the Defendant had "knocked down" glass in the back of the house. While seated in the front seat of the patrol car, the victim stated that her back hurt. She said there was blood in the basement from her fall on the stairs. In speaking on his police radio, Corporal Stiles noted that the victim had a laceration on her head. She said the Defendant pointed a gun at her and shot a bedroom wall. When asked why the Defendant fired the gun, she said he was trying to kill her. She agreed that the Defendant came into the home about 4:00 a.m. and said he entered through "glass" on the porch. She said she woke when she heard pounding, which she thought might have been from a storm. She said she got out of bed and saw the Defendant, who held a flashlight, "had a gun strapped across his side," and had two pistols. She said one of the pistols was "his Glock." She said she asked the Defendant, "What are you doing?" She stated that the last time the Defendant had been at the home, she had told him, "Get out." She said she ran to the bedroom to get her cell phone to call 9-1-1. She said that the Defendant had left a gun for her but that she would not have been able to use it. She said, "He wrestled me down." She said she did not want the Defendant to hurt himself. After other officers arrived, Corporal Stiles moved his patrol car and instructed the victim to stay inside the car. Corporal Stiles went to the car's trunk and took out a rifle. The victim told Corporal Stiles that the Defendant had stated he would shoot himself before he would let anyone take his guns and that the Defendant had written in spray paint on her basement walls. Corporal Stiles shouted, "Hands, both hands," and stated in a radio transmission that the Defendant had come onto the porch and had his hands raised. Corporal Stiles asked the Defendant if he was "Mr. Cochran" and told him to stay on the porch until other officers arrived. Armed with the rifle, Corporal Stiles walked closer to the home, but he remained at a distance on the opposite side of the driveway from the home until other officers arrived. Officer Stiles and other officers ran toward the home. The recording reflected a break or a redaction in the recording, after which Officer Stiles put

his rifle into his trunk and advised the victim that the Defendant was in custody and was unharmed. Officer Stiles stated that he was going to ask someone to examine the victim medically to determine if she needed treatment. He asked the victim if the officers could enter and search the house, and she granted permission.

Corporal Stiles testified that his recorded conversation with the Defendant began at 10:50 a.m. In the recording of the conversation, Corporal Stiles advised the Defendant of his *Miranda* rights, and the Defendant agreed to waive his rights. Corporal Stiles asked the Defendant about Corporal Stiles's having found the Defendant's van earlier, and the Defendant explained that he had come from Florida, where he had been living, and that he and the victim had maintained a good relationship until his last visit from Florida, when they "had words." He said they both had divorce attorneys. The Defendant said he sneaked into the house through the back door, which he kicked off its tracks. He said he asked the victim to go to the basement with him to talk. He said he asked the victim not to call the police because he had a "spotless record." He said, "I did put my hand on her because she . . . because I had a gun. She knows I keep a gun on me. Every time I'm up here, I've got a gun." He said he had .40- and .45-caliber Glock guns. He said that the victim "grabbed for" his gun and tried to take it from him, that they "got to scuffling," and that "she fell down the stairs." He said he went into the basement to talk to the victim. He said the victim tried to get his gun again and that he "had to restrain her" by grabbing her arms and pushing her, which he explained involved walking her into the basement. He said that he told the victim not to grab his gun again and that she "kn[e]w better than that." When Corporal Stiles asked how the Defendant kept the victim in the basement, the Defendant said he was holding two guns. He said he told the victim that he was going to "harm" himself. He said he had shot himself after his daughter was killed. He said he was not trying to harm anyone else. He said that he did not threaten to kill himself when he was inside the home with the victim but that he had said he would kill himself rather than go to jail. He said that he had not told the victim that he was coming to town and that he no longer had a key to the home because she had changed the locks. The Defendant stated that he and the victim had been married for thirty-six years and that he had never hurt her. He said that the present incident happened because she tried to get his gun. When asked if he threatened to shoot the victim and if he fired a gun inside the house, the Defendant agreed he had done both. He explained that the victim had a gun she had given him and that he was afraid she would shoot him. He said he fired the gun into the bedroom wall to the far right of the bed. He said that one gun was on a small table in the living room and that the other gun was in an antique chest. When Corporal Stiles asked a second time about why the Defendant had parked down the street, the Defendant said he was afraid the victim would "call the law." The Defendant said he had hoped he and the victim could work things out, despite the pending divorce litigation.

Corporal Stiles identified as exhibits two items found during the search of the home: a bag of ammunition and a box which had contained a loaded .40-caliber Glock gun. He

said the .45-caliber gun had also been loaded. He identified a .30-06-caliber rifle, which he said had been loaded and had been recovered from the master bedroom. He said the bag of ammunition had been found with the rifle and contained ammunition which was the appropriate type for the rifle. He said the victim recently "provided" him with a .22-caliber pistol. He said the Defendant never mentioned a .22-caliber pistol. He agreed that he and two other officers who searched the house did not find the .22-caliber pistol.

Corporal Stiles acknowledged that the victim had said the Defendant had not been violent toward her previously. He did not recall if the basement had an outside door other than the garage door or what types of tools had been in the garage. He agreed that he had been aware of the Defendant's prior suicide attempt. Corporal Stiles thought the Defendant or the victim had mentioned that the Defendant had done most of the construction to build the McMinn County house. Corporal Stiles said he had not recovered the projectile that had been fired into the bedroom wall because doing so would have caused further damage to the wall. He said he had not been told that a bulldog had been shot on "those steps" about three months earlier. He said the inventory sheet for the van's contents listed "[o]ne bag of meds." He said he did not look at the bottles inside the bag to determine if they contained medications prescribed to the Defendant. Corporal Stiles said he looked for but did not find a Glock cartridge casing in the house or on the Defendant's person. He said he did not perform gunshot residue testing on the Defendant or the victim. He said he was unaware of any court order prohibiting the Defendant from being in the McMinn County house at the time of the incident. Corporal Stiles agreed that the Defendant stated he had driven all night from Florida to Tennessee and that the Defendant said he did not want a divorce.

Corporal Stiles agreed that he had seen a cell phone next to a gun in the living room but said he did not know who owned the cell phone. He agreed that the Defendant cooperated when the Defendant came out of the house and when the officers took the Defendant into custody.

The victim testified that she and the Defendant were still married. She said they had been married for thirty-eight years and that they separated in December 2018. She said that they moved into the McMinn County home in February 2012 and that they previously owned a home in Florida. She said that when they separated in 2018, they agreed that she would live in the McMinn County home and that he would live in the Florida home.

The victim testified that on October 16, 2019, she was awakened by a loud noise. She said she looked at a digital clock and noticed that the time was 4:10 or 4:12 a.m. She said she got out of bed to determine what had caused the noise and that as she came out of the master bedroom, she saw the Defendant with a rifle, two pistols, and a flashlight. She said, "It looked like the movie Rambo" because he had the pistols in his hand and the

flashlight held in his teeth, which shined in her eyes. She said that she asked what the Defendant was doing and that he stated he was going to kill her. She said that she ran to get her cell phone from her nightstand and that "a gunshot went off" to her right in the master bedroom. She said that she held her cell phone close to her torso and fell onto the bed and that the Defendant overpowered her, took her cell phone, and placed it in his pocket. She said the Defendant choked her by putting his arm around her neck and that she struggled but could not get free until he released his hold. She said he threw her on the bed and hit her head "many times" for "maybe a couple of minutes" with his right fist. She said neither of them spoke during the assault. She said that after the assault ended, she stood, and the Defendant pulled her by her hair through the bedroom, kitchen, and living room to the basement stairs. She said that the Defendant released her hair, that she told him she needed to use the restroom, and that he told her to "get down those stairs now." She said she did not want to go downstairs. She saw the Defendant holding a pistol and tried to get away from him. She said he pushed her shoulder, which caused her to fall to the bottom of the stairs. She said she heard a gunshot and that a few days later, she saw a cartridge casing fall from a rug that had been standing in the basement corner and noticed a bullet hole in the rug. She said that after she fell down the steps, the Defendant came down the stairs holding a pistol and demanded that she get up. She said she stood and told him that she was bleeding. She said he said he did not care and demanded, "Get down, get in this basement now." She said she went at gunpoint into the basement. Referring to photographs of the stairs and the basement, she identified her blood on the stairs, wall, rug, and shop vac. She acknowledged that the Defendant shot a bulldog about one and one-half years before the incident but said the dog's blood had been cleaned up and that the blood in the photographs was hers.

The victim testified that she was scared and that the basement was "pretty full of things." She said the Defendant tried to get her to go into a part of the basement that was "studded up with two by fours" but that she said she could not get "through" due to previously stacked items which had fallen. She said he directed her to the area where the washer and dryer were and told her to sit on a child's picnic table. She said the Defendant sat against the washer and dryer with the gun on his leg. She said that he accused her of trying to "take everything in the divorce" and that she told him she only wanted her half. She said the Defendant called her the "glue" that held him together after his father's death and said they "could've had so much together" if they did not divorce. She said that after a long silence, she asked the Defendant what he was thinking and that he stated he was going to kill her and was trying to decide where he would kill himself. She said she asked him not to kill himself and reminded him that after a 2011 suicide attempt, he promised God that he would never try to kill himself again. She said that she would have "loved" to try to get out of the basement but that the Defendant held a gun on her continuously. She said that she asked several times if they could go upstairs but that the Defendant refused. She said that while they were in the basement, the Defendant took a can of spray paint from a shelf and wrote "My blood" on a wall and "My blood on U and Amy Blackwell" on

another wall.  The victim identified Ms. Blackwell as her divorce attorney.  The victim said that they were in the basement for several hours and that long periods of silence passed between their conversations.  The victim said that the Defendant retrieved a container of zip ties from a shelf and stated that he was going to bind her hands but that she begged him not to do this.  She said he stopped getting the zip ties from the container and turned to an "orange drop cord."  She said she was afraid he would choke her with the cord and begged him not to use the cord.  She said he placed a belt around her waist.  She said that she asked, "Why are you doing this to me?" and that he responded, "You are my hostage."  She said that the Defendant thought he heard footsteps and that they went upstairs.  She said the Defendant stated that if the police were at the home, he would shoot her and then kill himself before the police could shoot him.

The victim testified that the Defendant held her by the back of the belt he had placed on her and had her go into rooms to ensure that the police were not present.  She said the Defendant held a pistol and the belt as she walked through the home.  She said she told the Defendant that she had to use the restroom and that he permitted her to go to the restroom but would not allow her to close the door.  She said the Defendant held the gun at his side while she used the restroom.  She said the couple owned four dogs and that the Defendant let one dog go outside after she left the restroom.  She said while she and the Defendant had been in the basement, three other dogs had gone outside through the broken door through which the Defendant had entered.  She said that the dogs would not come inside when the Defendant called them and that he had her stand behind a door and call them.  She said she did not leave the home to walk the dogs.

The victim testified that she and the Defendant sat in the living room.  She said the Defendant told her twice to wash her face, which was stained with blood.  She said he told her a third time and lifted the pistol toward her.  She said she went into the master bathroom and washed the blood from her face.  She said she saw a clock, which showed the time as 10:02 a.m.  She said that when she returned to the living room, the Defendant told her that the police were outside and told her to go outside and "act like nothing is going on."  She said he stated, "You better not tell them nothing."

The victim testified that she went outside and that she began crying when Corporal Stiles approached her.  She said she told Corporal Stiles that her husband was in the home, that he fired a shot inside the home, that he kept her there and took her into the basement, and that he threatened to kill her.  She identified the rifle which had been previously identified as having been recovered from the master bedroom as the rifle the Defendant had "around his chest and back."  She identified the Glock pistols previously identified as exhibits as the other weapons the Defendant had possessed.

The victim testified that sometime after the incident, she found a cocked .22-caliber pistol in a toolbox in a guest bathroom of the home. She thought the gun had belonged to the Defendant's father. She said she later provided the gun to Corporal Stiles.

The victim testified that the Defendant did some of the construction work on the McMinn County house they owned. She said she filed for divorce in July 2019 and thought the Defendant had been to the McMinn County home three times after she filed for divorce, the last being the present incident. She said that on previous occasions when the Defendant came to the home, he told her ahead of time that he was coming and that he arrived in the afternoon. She said that he slept on a sofa or in a recliner in the home when he came to Tennessee and that he sometimes removed belongings from the home late at night. She said that when the Defendant was at the home in August 2019, they argued for about two hours over "papers" he wanted her to get from her attorney the next morning. She denied that she had attacked him, clawed his face, or threatened to call the police. She said that twice, she told the Defendant to leave the home and that he left eventually. She said that before he left, he told her that she "would pay" and that he would take "almost everything." When asked if she told him not to return to the home, she said she told him to leave. She said that she did not change the locks and that the Defendant had keys to the home. She said that she had given the Defendant her key to the Florida house when they separated but that the Defendant had refused to surrender his keys to the Tennessee house. She said she did not have a court order regarding who had rights of access to the houses but that she and the Defendant signed a document in August 2018 stating that she would live in the Tennessee house and that he would live in the Florida house. She said the Defendant had wanted them to sign this document, which she acknowledged predated the divorce proceedings.

The victim testified that the Defendant's daughter had been "part of a homicide investigation." The victim said the daughter's mother had died in a car wreck and that the victim had raised the child as her own. The victim agreed that the daughter's death in 2009 had been difficult for the Defendant and that he tried to commit suicide in 2011. She acknowledged that the Defendant had been diagnosed with anxiety and depression but stated that she was not aware of a bipolar disorder diagnosis. She agreed the Defendant "took a lot of medication."

When asked if she had told Corporal Stiles that she had gone into the bedroom to get a gun, the victim testified that she had told him that the Defendant had given her a gun in December 2018. She said the gun was in a dresser and not near her nightstand, where her cell phone was stored. She said she told Corporal Stiles this because she wanted him to know about another gun inside the house.

The victim testified that the upstairs of the house had two outside doors and that the basement had a garage door and a second outside door. She said that the basement door

was inaccessible from inside the basement because items were stored in front of it and that the garage door opener was broken. She said the master bathroom had two windows that were about 30″ wide and 2.5 to 3′ tall. She said that the windows did not extend to the floor and that they opened to the deck. She agreed that the Defendant carried guns on his person throughout their marriage.

The victim testified that she did not go to the emergency room after the incident and that she saw a doctor about one week later for bruising on her back and tailbone, which she thought might indicate a broken bone.

The Defendant elected not to present evidence.

The jury acquitted the Defendant of especially aggravated kidnapping but convicted him of the lesser-included offense of aggravated kidnapping. At a sentencing hearing, the trial court imposed a nine-year sentence. This appeal followed.

# I

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his statement to Corporal Stiles at the scene. The trial court suppressed the portion of the Defendant's statement which preceded the *Miranda* warnings but denied the motion as to the portion which followed. The State contends that the court did not err in denying the motion to suppress. We agree with the State.

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered voluntary, a statement must not be the product of "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id*. The essential inquiry is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-

determined[.]" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). "The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence." *State v. Willis*, 496 S.W.3d 653, 695 (Tenn. 2016).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

At the suppression hearing, Corporal Stiles testified consistently with his trial testimony regarding his initial response to the victim's home and his encounter with the victim outside the home. Corporal Stiles said that after backup officers arrived, they detained the Defendant, who had come outside onto the front porch, and placed him in the backseat of a patrol truck. Corporal Stiles said he instructed the other officers not to speak to the Defendant while Corporal Stiles placed his rifle into the trunk of his patrol car and that the other officers did not talk to the Defendant.

Corporal Stiles testified that he advised the Defendant of his *Miranda* rights and that this was recorded using his body camera. The recording was received as an exhibit and contained two files. One file depicted the Defendant's arrest on the porch and his being placed in a police truck, and the second depicted Corporal Stiles reading the Defendant his *Miranda* rights and the Defendant's statement to Corporal Stiles at the scene. The first file showed three uniformed, armed officers running toward the home's porch. An officer handcuffed the Defendant, who was lying on his stomach on the porch. Corporal Stiles asked the Defendant if anyone else was inside the home and if the Defendant had guns or knives on his person. Two officers helped the Defendant stand after he was handcuffed. Corporal Stiles told the Defendant that they would talk after the officers "got [the Defendant] situated." When Corporal Stiles asked if the Defendant drank any alcohol that day or the previous night, the Defendant responded that he had not. When Corporal Stiles asked the Defendant if he had taken any medication, the Defendant responded that he took "a lot of medication" for depression and listed the medications. The Defendant made a statement about loving the victim. Two additional officers arrived but stayed at the end of the driveway away from the porch where the Defendant and the other officers were. Corporal Stiles told the Defendant that he should sit in the back of the police truck and that Corporal Stiles would talk to him shortly. An officer walked with the Defendant to the truck. Corporal Stiles told the other officers that he was going to read the Defendant his rights before questioning him, and Corporal Stiles walked to his patrol car, which was parked across the street, to put his rifle in the trunk and speak to the victim. The second file reviewed at the suppression hearing was the one which was later received as evidence at the trial.

Corporal Stiles testified that "a couple of hours" elapsed between the time he received the initial call about the parked van at a neighbor's property and his going to the victim's home. He said that during this time, the authorities were investigating the identity of the van's owner. He said he went to the victim's home about 10:00 a.m. He said the Defendant came outside with his hands up about one minute before the backup officers arrived. Corporal Stiles thought Deputy Bausch walked the Defendant to the truck after the three officers took the Defendant into custody. Corporal Stiles said that if Deputy Bausch and the Defendant had any conversation, Corporal Stiles did not hear it. Corporal Stiles said, however, that the handcuffed Defendant "was talking until we put him in the truck." Corporal Stiles agreed that the Defendant had not been given *Miranda* warnings at

this point and stated that the Defendant "began talking on his own" without being asked any questions.

Corporal Stiles testified that after the Defendant was seated in the truck, Corporal Stiles read the *Miranda* rights from a card. Corporal Stiles said the Defendant mentioned that he and the victim were divorcing and that he had an attorney. Corporal Stiles described the Defendant as "upset" and said the Defendant mentioned that he took medications for depression. Corporal Stiles said the Defendant mentioned that his daughter had passed away.

The trial court found that Corporal Stiles read advised the Defendant of the full *Miranda* admonitions by reading them from a card. The court found, based upon the video recording, that the Defendant "appeared very calm, and really, all things considered, absent emotion." The court noted that the Defendant had been emotional in the recording of the arrest and that he was "calm and stoic" in the second recording. The court found that the Defendant mentioned his prescribed Xanax, that he "provided informed and appropriate responses," and that he "possessed a clear working knowledge of both short and long term memory." The court found that the second recording demonstrated that the Defendant "expressed not just voluntariness but also an inherent logic and . . . reasonableness." The court noted that the Defendant appeared to possess average intelligence but "minimal [prior] experience with the criminal justice system." The court found that, nevertheless, the Defendant was "comfortable and confident enough to express his own story and memory of the events at issue in this case." The court found that Corporal Stiles had not engaged in suggestive or coercive tactics in the interview and that the Defendant "want[ed] to talk," to minimize his involvement, and to explain that although he fired a gun, he did not fire it at the victim and just wanted to talk to her about the divorce. The court found that the Defendant did not appear impaired from the medication he reported he had taken. The court found that the Defendant voluntarily waived his *Miranda* rights and gave the statement. The court ruled that the first recording, which was before the *Miranda* warnings were given, was suppressed but that the second recording was admissible.

The Defendant argues on appeal that he possessed minimal education, having dropped out of school after the eighth grade, and that he did not read and write well. He also argues that the statement was given shortly after a "very physical arrest," in which the Defendant was in "an emotional state." He notes his lack of prior experience with law enforcement, his "extensive history of mental illness and suicide attempts," and his use of medication. The Defendant also argues that the manner, detail, and language of Corporal Stiles's *Miranda* admonition was insufficient. Thus, the Defendant concludes that he did not knowingly, intelligently, and voluntarily waive his rights and that the trial court erred in denying the motion to suppress the evidence of his statement.

We have reviewed the evidence offered at the suppression hearing, as well as the relevant trial evidence. The video recordings show that the Defendant was arrested at gunpoint while prone on the porch of the victim's home, at which time he was upset and emotional. After he was taken to a police truck and several minutes had elapsed, Corporal Stiles advised him of his *Miranda* rights, and the Defendant, who was calm and not emotional, agreed to waive his rights. The Defendant gave a statement in which he clearly and logically explained his version of the relevant events.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings. *See Odom*, 928 S.W.2d at 23; *Jones*, 802 S.W.2d at 223. The trial court did not err in denying the motion to suppress.

## II

### Denial of Motion for a Continuance

The Defendant contends that the trial court abused its discretion in denying his motion to continue the trial after the State elected, on the morning of the trial, to nolle prosequi the attempted first degree murder count of the indictment. He acknowledges that he failed to raise this issue in the motion for a new trial but asks this court to grant relief pursuant to Tennessee Rule of Appellate Procedure 36(b) and *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), generally known as the plain error doctrine. To this end, he argues that the last-minute notice of the State's decision not to pursue the attempted first degree murder charge deprived him of his constitutional right to the effective assistance of counsel because his attorneys were "unable to effectively change their trial strategy" in the wake of the State's "tactical bombshell." The State responds that the Defendant has not shown that he is entitled to relief as a matter of plain error. We agree with the State.

As the Defendant notes, he failed to raise this issue in the motion for a new trial. Tennessee Rule of Appellate Procedure 3(e) states, in pertinent part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

T.R.A.P. 3(e). The issue is waived. *See id.*; *cf. State v. Johnson*, 980 S.W.414, 418 (Tenn. Crim. App. 1998) (holding that the defendant waived issue regarding denial of a continuance because the motion for a new trial was untimely). Our review is limited to

one for plain error. *See* T.R.A.P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

"[A] motion for a continuance is addressed to the sole discretion of the trial judge," and the judge's decision "will not be reversed on appeal absent an abuse of discretion and prejudice to the defendant." *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973); *State v. Willis*, 496 S.W.3d 653, 744 (Tenn. 2016); *see State v. Goodwin*, 909 S.W.2d 35, 44 (Tenn. 1995). It is the appealing party's burden to show how the trial court's decision was prejudicial. *Baxter*, 503 S.W.2d at 230. The critical inquiry "is whether one has been deprived of his rights and whether an injustice has been done." *Id*. As a result, the record must reflect that "the denial of the requested continuance 'denied the defendant a fair trial or that the result of the trial would have been different.'" *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (quoting *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)); *see Willis*, 496 S.W.3d at 744; *Goodwin*, 909 S.W.2d at 44.

Upon review of the record, we conclude that the Defendant cannot establish the breach of a clear and unequivocal rule of law, that a substantial right was affected, and that consideration of the issue is necessary to do substantial justice. *See Smith*, 24 S.W.3d at 282 (Tenn. 2000); *Adkisson*, 899 S.W.2d at 641-42. Trial counsel argued in support of its motion to continue that its defense strategy would be "disjointed and disorganized" if a

continuance were not granted. However, the record fails to reflect that trial counsel was unable to present a logical and cohesive opening statement and closing argument, to cross-examine witnesses, and to raise objections. Because the issue was not raised in the motion for new trial, the record fails to contain specific information from trial counsel about an actual inability or impairment which occurred in the trial of the case, particularly instances in which trial counsel were unable to fulfill their duties to provide the Defendant with the effective assistance of counsel. Because the Defendant cannot establish the *Smith/Adkisson* plain error requisites, he is not entitled to relief on this basis.

## III

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his aggravated kidnapping conviction. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to the present case, "(a) Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(a)(5) (2018). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a) (2018).

Viewed in the light most favorable to the State, the evidence shows that the Defendant, determined to talk to the victim about their pending divorce because he opposed it, entered her home in the early morning hours by kicking in a door. The Defendant was armed with three guns, one of which he fired when the victim tried to get her cell phone to call 9-1-1. The Defendant beat the victim and pushed her into a basement, where he confined her at gunpoint for several hours and threatened to kill her and to kill himself. The Defendant told the victim that she was his hostage and continued the confinement until a police officer arrived. The victim was able to extricate herself when the Defendant told her to go outside to talk to the officer but not to tell him what was happening inside the home.

We have considered the Defendant's arguments that the victim's account contained inconsistencies and that forensic evidence related to gunshot residue and blood was not collected and analyzed. He also argues that he was not prohibited by court order from entering the home. We note, first, that the Defendant admitted firing a weapon inside the home, that the Defendant admitted he entered the home forcibly while armed, that he "scuffled" with the victim, and that he admitted he held her in the basement at gunpoint in order to discuss the divorce with her. We note, as well, the Defendant's statement that the victim bled and Corporal Stiles's observation of blood on the victim. To the extent that the Defendant invites this court to reweigh the evidence by discrediting the victim's testimony, we must decline to invade the province of the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547.

The evidence is sufficient to support the Defendant's conviction. He is not entitled to relief on this basis.

## IV

### Sentencing

The Defendant contends that the trial court imposed an excessive sentence of nine years, rather than the eight-year minimum sentence. The State counters that the court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant

-16-

made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

At the sentencing hearing, the presentence report was received as an exhibit and reflected the following: The fifty-nine-year-old Defendant had no prior criminal convictions. He dropped out of school in the eighth grade. He reported current good mental health due to his psychiatric medications being "stabilized." He did not currently drink alcohol and had never used drugs. The Defendant had been employed as a fabricator at a pool company until he was incarcerated upon his conviction. He also had employment history with Lowe's and self-employment as a handyman, carpenter, and motorcycle shop owner. His Risk Assessment Tool evaluation determined that he was "a low risk offender."

The Defendant provided a statement regarding his version of the events, in which he minimized his culpability. He acknowledged coming into the McMinn County home by kicking in a door while armed with two Glock pistols, which he said he always had when he traveled. He stated that he wanted to talk to the victim, that the gunshot had been fired accidentally when the victim reached for the gun, that the victim reached for his gun a second time and fell down the basement steps because she lost her balance when he pulled back, and that they had conversations in the basement and the living room. He said he had no ill will toward anyone and planned to be kind and make the best of all circumstances he faced. He said he planned to remarry and build another house. He recounted his religious faith. He asked the trial court to afford him a second chance and promised he would "do it right."

The Defendant's sister submitted a letter, which was incorporated in the family information section of the presentence report. The letter detailed the divorce of the Defendant's parents, his upbringing in an abusive home, his parenting a daughter when his first wife left him and was later killed in a car wreck, his care of his daughter when she had a brain tumor, his daughter's drug abuse and eventual death, his depression after her death,

the death of the Defendant's father and its effect on the Defendant, the Defendant's suicide attempt, the Defendant's sister's suspicion that the Defendant's prescription medications were not properly regulated at the time of the present offense, the Defendant's industrious nature and role as a provider for his family, his devastation when the victim sought to divorce him, and signs of his mental illness of which the sister became aware after the Defendant's arrest in the present case.

The victim testified that she still thought about the offense daily and that she had nightmares about it. She said she lived in constant fear of the Defendant's returning to kill her. She said she cried frequently. She said that she sought medical care due to her injuries from the incident and that she had difficulty walking for a month. She said that she spent money to repair the door the Defendant kicked in during the incident and that she was still upset when she saw the bullet hole in the bedroom wall and the spray paint in the basement. She said that she had eleven text message alerts related to the Defendant's release on bond with an ankle monitor and that on one occasion, the police told her to leave her house for the night because the Defendant was within nine miles of her home.

The victim testified that the Defendant had always had a bad temper and that he had been verbally and physically abusive to her and their children during their marriage. She said that in road rage incidents, he had pointed a pistol at other motorists. She said that he often had problems with others, including at work and with neighbors, and that neighbors in both Tennessee and Florida had called the police about the Defendant's conduct. The victim said that toward the end of their marriage, the Defendant would block her car with another car to which she did not have keys in order to keep her at home while he was at work.

The Defendant's son testified that the victim had struggled emotionally since the offense. He said he was not surprised by his father's behavior which led to the conviction, which was consistent with the Defendant's behavior the son had observed for all of the son's life. The son said the Defendant had "almost brag[ged]" over the years about an incident at a tee ball game in which the Defendant had been involved in an altercation with another parent, who was a Green Beret, in which the Defendant "ran the gentleman out with a knife." The Defendant's son said he had been removed from the tee ball team and banned from the ballpark as a result of the Defendant's conduct. The Defendant's son recalled an incident when he was age eight and observed the Defendant with "pure rage in his eyes" and his hands around the victim's neck. The Defendant's son said he had been terrified of disappointing or frustrating the Defendant. The Defendant's son said that he had drug charges as a juvenile and that the Defendant threw him against a closet door and choked him when the Defendant came home. The Defendant's son said he had been diagnosed as an adult with post-traumatic stress disorder related to the Defendant's fits of rage in the son's childhood.

The Defendant's son testified that after the Defendant's "first" suicide attempt, the police confiscated the Defendant's guns and asked the son to take them for safekeeping until the Defendant was healthy. The Defendant's son said that when he took the Defendant home from the hospital, the Defendant began asking about the guns within ten minutes. The Defendant's son said the Defendant became "enraged" and "unglued" on the way home from the hospital. The Defendant's son said the Defendant threatened to go to the son's mother-in-law's house and "turn [it] upside down" because the Defendant thought the guns might be stored there. The Defendant's son said that his wife and children were at his mother-in-law's house and that because he was concerned for their safety, he agreed to get the Defendant's guns. The Defendant's son said he felt responsible for the Defendant's attempted suicide about two weeks later. The Defendant's son said that a few years ago, the Defendant's brother had obtained an order of protection due to threats from the Defendant.

The Defendant's son testified that he had been estranged from the Defendant since the son's wife accused the Defendant of trying to sexually assault her. The Defendant's son said that on another occasion, he had asked the Defendant not to use certain language around the son's children and that the Defendant became enraged and threw his son out of the house. The Defendant's son said, though, that he did not hold a grudge against the Defendant and that he prayed for the Defendant.

The trial court credited the testimony of the victim and the Defendant's son and stated that it gave the son's testimony great weight. Relative to enhancement factors, the court found that, based upon the Defendant's son's testimony, the Defendant had a prior history of criminal behavior involving domestic violence and the assault at the tee ball game. *See* T.C.A. § 40-35-114(1) (2019) (subsequently amended) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court also found the Defendant treated the victim with exceptional cruelty, noting the trial evidence that the Defendant fired a gun in the victim's bedroom, the physical injuries the victim sustained, the blood on the stairs, and the terrifying circumstances surrounding the victim's confinement in the basement with the spray painting on the walls, the length of the detention, the display of a weapon, and the threats by the Defendant to kill himself and the victim. *See id.* at (5) ("The defendant treated . . . a victim . . . with exceptional cruelty during the commission of the offense[.]"). Considering the mitigating factors, the trial court found that the Defendant voluntarily released the victim and that he "voluntarily provided information which led to his own prosecution." *See id.* § 39-13-304(b)(2) (2018) ("If the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing."). The court found, as well, that despite the Defendant's history of violent behavior, he had no prior criminal convictions, and that he had been financially successful and had provided for his family. *See id.* § 40-35-113(13) (2019) (subsequently amended)

-19-

(allowing mitigation for "[a]ny other factor consistent with the purposes of this chapter."). Upon balancing the enhancement and mitigating factors, the court afforded greater weight to the enhancement factors, "but not by much." The court noted that the offense was statutorily ineligible for alternative sentencing and that the sentencing range for the Defendant as a Range I offender was eight to twelve years. The court concluded that the appropriate sentence was nine years in the Department of Correction.

The Defendant does not argue that the trial court erred in applying the enhancement factors or that it failed to apply relevant mitigating factors. Rather, he argues that the court erred in its weighing of the factors. In his view, the court should not have given considerable weight to the Defendant's son's testimony about domestic violence because it "implicitly discredited [the victim's] testimony regarding [the Defendant's] previous violence." Our supreme court has said, "[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706. In any event, the evidence showed that although the victim initially maintained that the Defendant had not been violent toward her before the date of the crime, she testified at the sentencing hearing about the Defendant's verbal and physical abuse. She testified, as well, about her fear after the crime that the Defendant would return and kill her. The court made specific findings crediting the testimony of the victim's son regarding the Defendant's prior domestic abuse and violence. It is not the function of this court to substitute our judgment for that of the trial court, made after hearing the testimony and observing the witnesses presented at the sentencing hearing. *See generally id.* at 708.

The record reflects that the trial court followed the statutory guidelines for sentencing, including its reflection upon the appropriate considerations and factors. *See* T.C.A. §§ 40-35-103, -210; *Ashby*, 823 S.W.2d at 168. The court made findings regarding the applicable enhancement and mitigating factors based upon the evidence from the trial and the sentencing hearing. The court announced its deliberative process in weighing the factors and its reason for affording greater weight to the enhancement factors. It imposed a within-range sentence. Affording the court the presumption of reasonableness, we conclude that the court did not abuse its discretion in sentencing the Defendant to nine years. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE